# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

| | |
|---|---|
| MARIA JERNIGAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Cause No. 3:11-cv-491-PPS |
| v. | ) |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Maria Jernigan was involved in a car accident in 1999. She fractured her left elbow, her left humerus and her left femur. She claims that these injuries cause her severe physical pain such that she cannot work (despite the fact that it appears that she worked intermittently in the decade-plus since her accident). Jernigan filed an application for Title II disability benefits which was ultimately denied by an ALJ. His rationale was straightforward. Although two of Jernigan's physicians opined that she could only stand for two hours in an eight hour period – and thus could not hold down a job – the ALJ simply didn't agree. Based on his interpretation of the record before him, he concluded that, in fact, Jernigan's physical and mental limitations should not prevent her from working at a number of unskilled light-work jobs.

Jernigan seeks judicial review of this decision. She asserts only one argument – that the ALJ only addressed *one* of the physicians' opinions. Jernigan says that the ALJ's failure to explain why he didn't believe that *other* (identical) opinion warrants remand.

I agree that the ALJ didn't specify that he was responding to the second doctor when he

1

explained why he thought that Jernigan could stand for more than two hours in a work day. But that shouldn't matter. The point is, he adequately responded to the substantive issue in question when he addressed the other doctor's opinion. That's enough – and even if not, any error would be harmless. Therefore, for the further reasons discussed below, the agency decision is **AFFIRMED**.

## BACKGROUND

Jernigan's physical impairment stem from a 1999 car accident, in which she suffered several broken bones in her left arm and leg. (R. at 14.) She says that the lingering effects from this injury include severe pain, and that, as a result, she can't hold a job. (*Id.* at 57-61) This claim is at odds with the fact that Jernigan was employed off and on from 1999 to 2009, and seems to have earned a good bit of money during that period. (*Id.* at 44.) She also suffers from depression and generalized anxiety disorder. (*Id.* at 12.)

Jernigan filed an application for Title II social security disability benefits in 2009 which was initially denied by the SSA. (*Id.* at 10.) An ALJ subsequently upheld the agency denial, and that denial is now before me on judicial review. (*Id.*).

Unlike most social security appeals, Jernigan raises only one issue: did the ALJ err by failing to adequately consider the opinion of one of her physicians, Dr. Benjamin Nelson, M.D., who determined that she had sufficient residual functional capacity to engage in light work?[1] (DE 20 at 9-11.) She specifically contends that the ALJ disregarded Dr. Nelson's opinion that

---

[1] Assessing a social security disability applicant's residual functional capacity is one of the five "Steps" that an ALJ must undertake to determine eligibility. *See Winfield v. Comm'r of Soc. Sec.*, Cause No. 2:11–cv–432–PPS, 2013 WL 692408, at *3 (N.D. Ind. Feb. 25, 2013) (explaining the "Step" terminology).

2

she could only stand for two hours in an eight hour period. (DE 31 at 1-2.) Dr. Nelson is not the only physician to offer that opinion. Indeed, another doctor who treated Jernigan on many occasions over the years (R. at 242-62), Dr. John Kratzer, D.O., also noted that he believed that she could only stand for two hours (and walk for one hour) in an eight hour period. (*Id.* at 16.)

The limitation is an important one. That's because the vocational expert who testified at the administrative hearing concluded that someone who could only stand for such a brief period during a normal workday likely could not hold the jobs that might be suitable for Jernigan. (*Id.* at 72-73.) In other words, if you believe Dr. Nelson and Dr. Kratzer, then Jernigan's application probably shouldn't have been denied.

But the ALJ didn't believe that she was limited to standing for two hours during an eight hour period. Instead, he addressed Dr. Kratzer's – but notably, not Dr. Nelson's – opinion, arguing that it was undercut by both the fact that Jernigan never sought any medical care for her purportedly severe condition, as well as her ability to perform various household chores. (*Id.* at 17-18.) Furthermore, based on Dr. Kratzer's treatment notes, it appears that Jernigan saw him more than twenty times over the years for a number of routine reasons (flu shots, a cough, a rash and diabetes screening). (*Id.* at 18; 242-62.) The ALJ concluded that this willingness to seek medical attention for relatively mundane conditions or treatments rendered Jernigan's claim that she was suffering extreme and debilitating (but untreated) pain not credible. (*Id.*)

As alluded to above, the ALJ didn't address whether he was rejecting Dr. Nelson's identical opinion. Instead, he simply summarized Dr. Nelson's conclusions without saying whether or not he found them credible. (*Id.* at 15-16.) Jernigan argues that this omission is fatal to his decision. (DE 31 at 1.) She asks me to remand the matter back to the ALJ so that he can

incorporate Dr. Nelson's opinion into his analysis. (DE 20 at 11.) I'll decline to do so for the reasons explained below.

## DISCUSSION

If the ALJ's findings of fact are supported by "substantial evidence" then they must be sustained. *See* 42 U.S.C. § 405(g). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009) (*quoting Richardson v. Perales*, 402 U.S. 389, 399-400 (1971)). Review of the ALJ's findings is deferential. *See Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). In making a substantial evidence determination, I will review the record as a whole, but will not re-weigh the evidence or substitute my judgment for that of the ALJ. *Id*.

"Although this standard is generous, it is not entirely uncritical." *Id*. at 462 (*quoting Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)). I must ensure that the ALJ has built a "logical bridge" between the evidence and the result. *See Getch v. Astrue*, 539 F.3d 473, 481 (7th Cir. 2008). However, if reasonable minds could differ on whether a claimant is disabled, I must affirm the Commissioner's decision denying benefits. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

### Dr. Nelson as a Nontreating Physician

The first issue that I must resolve involves the question of whether Dr. Nelson was Jernigan's treating physician for the purposes of the ALJ's residual functional capacity analysis. This is an important determination, because if he was her treating physician, then his opinion must be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20

4

C.F.R. § 404.1527(c)(2); *accord White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). If, on the other hand, Dr. Nelson was not a treating physician, then the ALJ merely must consider his opinion and "confront" it insofar as it conflicts with his ultimate decision. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996).

The SSA argues that because Dr. Nelson only saw Jernigan on two occasions over an eight month period in 2010 and 2011, he was not her treating physician.[2] (DE 26 at 6.) It cites a number of authorities, both from the Seventh Circuit and elsewhere, holding that a doctor will be a nontreating physician when he or she "has examined [the applicant] but does not have, or did not have, an ongoing treatment relationship with [the applicant]." *White*, 415 F.3d at 658 (*quoting* 20 C.F.R. § 404.1502).

Jernigan responds by arguing that the frequency of visits is not determinative. She cites federal regulations, which explain the factors that the SSA will consider when determining whether a particular doctor is a treating physician:

> Generally, we will consider that [an applicant] ha[s] an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that [the applicant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the applicant's] medical condition(s). We may consider an acceptable medical source who has treated or evaluated [the applicant] only a few times or only after long intervals (e.g., twice a year) to be [the applicant's] treating source if the nature and frequency of the treatment or evaluation is typical for [the applicant's] condition(s).

---

[2] There's also some evidence suggesting that Jernigan saw Dr. Nelson in approximately 2001, though it's just a vague notation ("States Dr. Nelson did sx 9 years ago.") in his June 23, 2010 treatment notes. (R. at 304.) In any event, this visit occurred much too long ago to impact my treating physician analysis.

5

20 C.F.R. § 404.1502. Jernigan suggests that in this particular context – *i.e.*, seeing an orthopedic physician for knee and elbow pain – two visits over eight months is sufficient to constitute an ongoing treatment relationship.

The SSA has the better side of this issue. It's true that seeing a doctor a couple of times a year can constitute a treating relationship if the patient intends to keep visiting the physician on an ongoing basis. *See, e.g., Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) (noting that the ongoing nature of a doctor-patient relationship is critical to the treating physician analysis); *White*, 415 F.3d at 658 (same). But this isn't what happened here. Jernigan saw Dr. Nelson once in 2010, once more in 2011, and then she didn't go back. That's hardly an ongoing relationship.

Two things especially tip the scales for me. First, it appears that Jernigan's second visit in January 2011 was primarily so that Dr. Nelson could fill out her "Physicians Statement of Ability to Do Work Related Activities" form. Courts generally hold that a doctor who merely provides an opinion in connection with a social security disability application isn't a treating physician. *See, e.g., Simila*, 573 F.3d at 514; *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). Second, the professed severity of Jernigan's impairments actually cuts against her argument that Dr. Nelson was a treating physician in this case. Jernigan claims that she experiences constant and severe pain, as well as repeated numbness in her injured leg sufficient to cause her to fall. (R. at 57-59.) It seems farfetched to think that someone experiencing such debilitating symptoms would only see her regular orthopedic physician twice over a several month period, and then stop going altogether. Instead, Jernigan's relationship with Dr. Nelson seems more along the lines of a couple of isolated and discrete examinations and consultations, with no intention of returning.

## The ALJ's Confrontation of Dr. Nelson's Opinion

So the ALJ wasn't required to give Dr. Nelson's (non-treating) opinion controlling weight. But he still was required to consider it. *See, e.g., Godbey v. Apfel*, 238 F.3d 803, 807-08 (7th Cir. 2000) (holding that failure to consider an examining doctor's opinion is an error). And as noted above, when there is conflicting evidence in the record – as is the case with respect to the question of whether Jernigan can stand for long enough periods to hold a job – the ALJ must "build a bridge from the evidence to [his or her] conclusion." *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998); *accord Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ did that here. He concluded that Jernigan's willingness to seek frequent and routine medical treatment from her primary physician, Dr. Kratzer, was inconsistent with her claim that she was suffering from severe, ongoing arm and knee pain. (R. at 17-18.) That makes a good deal of sense. Why would she go to the doctor routinely for flu shots or diabetes screening or rash treatment, but not for pain in her knee and her arm that was so intense that she couldn't stand for more than a couple of hours in the day? The ALJ also cited the fact that Jernigan indicated that she had been feeling well during her visits with Dr. Kratzer. (*Id.* at 18.) Again, this isn't the response that one would expect from someone suffering from her professed level of pain.

This analysis seems to be enough on its face to build the requisite "bridge" from the evidence to the ALJ's decision, at least with respect to Dr. Kratzer's opinion. Evidently, Jernigan agrees with the ALJ's rejection of Dr. Kratzer's opinion since she has not challenged it in this appeal. But what about Dr. Nelson's? The ALJ only summarized Dr. Nelson's opinion that she could only stand for a short period during a normal work day, and he didn't really respond to it

(at least not directly). But he certainly confronted the substance of the opinion when he explained why he was rejecting Dr. Kratzer's identical one. And recall that Kratzer was an actual *treating physician* who saw Jernigan more than twenty times over the years. (R. at 242-62.)

The only question before me is whether the ALJ's failure to say something along the lines of "my analysis of Dr. Kratzer also applies to Dr. Nelson's opinion" requires remand. Why would it? If the ALJ properly rejected the opinion of the treating physician – someone who saw Jernigan more than twenty times over the years – that rejection would necessarily mean that ALJ was also rejecting the same opinion of a nontreating physician who only saw Jernigan twice.

The Seventh Circuit has made it clear that an ALJ need not discuss every piece of evidence. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (cataloguing authorities). Now, it's true that the Seventh Circuit *also* requires that an ALJ "must confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003) (*citing Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994)). But the point of this requirement isn't that an ALJ must name every single piece of evidence that is even arguably contrary to his or her decision and explain why he is rejecting it. Rather, it's that an ALJ must fully acknowledge and incorporate the applicant's limitations into the ultimate decision. *See Kasarsky*, 335 F.3d at 544; *Begley v. Astrue*, No. 1:10-cv-01113-SEB-TAB, 2011 WL 3739339, at *4 (S.D. Ind. Aug. 23, 2011) (explaining the point of *Kasarsky* and similar cases).

And there's a good reason why an ALJ must do this. As noted above, I must be sure that an ALJ has built a logical bridge from the evidence to his conclusion. *See Groves*, 148 F.3d at 811; *Clifford*, 227 F.3d at 872. But if an ALJ's decision does not at least acknowledge an

applicant's disputed limitations, then how can I know whether the ALJ actually considered those limitations, or whether he just ignored them? *That's* why an ALJ must confront contradictory evidence – so a reviewing judge can be sure that he considered it. *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000); *see also Kararsky*, 335 F.3d at 544 (noting that the ALJ's failure to discuss a limitation required remand because it was otherwise impossible to tell whether he considered it).

There can be no doubt that the ALJ considered Dr. Nelson's opinion in this case. First and foremost, he provided a reasonably detailed summary of it, indicating that he was fully aware of its particulars when reaching his decision. (R. at 15-16.) Second, he *did* explain why he didn't believe that Jernigan could only stand for two hours during an eight hour period. He just did so in the context of responding to Dr. Kratzer's opinion. (*Id.* at 18.) That has to be good enough to build the necessary bridge from the evidence to the ALJ's ultimate decision. *See, e.g., Sutherland v. Astrue*, No. 2:11-cv-24, 2012 WL 911898, at *7-8 (N.D. Ind. Mar. 15, 2012) (noting that the ALJ did not err by failing to discuss specific pieces of evidence involving an applicant's mental impairment when he generally addressed that impairment).

### Failure to Consider Dr. Nelson's Opinion as Harmless Error

And even if that's wrong, Jernigan still cannot prevail. Not all instances of ALJ error warrant remand. To the contrary, "administrative error may be harmless: [courts] will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *accord Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). In other words, "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is

9

overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time." *Spiva*, 628 F.3d at 353.

I am mindful that the harmless error doctrine must be construed narrowly. As the Seventh Circuit has repeatedly admonished, "[T]he harmless error standard is not... an exercise in rationalizing the ALJ's decision and substituting [the court's] own hypothetical explanations for the ALJ's inadequate articulation." *McKinzey*, 641 F.3d at 892; *accord Spiva*, 628 F.3d at 353. So it's not an excuse for me to rewrite an ALJ decision to say what I think it should have in the first place. But invoking the harmless error principle will be appropriate where it seems overwhelmingly likely that the remand would result in the same decision.

It's hard to think of a social security disability case more suited to the doctrine than this one. Again, let's assume that I'm wrong in concluding that the ALJ adequately confronted the contradictory evidence in the record when he explained why he was rejecting Dr. Kratzer's (but not Dr. Nelson's) opinion. Even in that case, it is virtually inevitable that he would reach the same result again, for one simple reason. *He's already explained his analysis of the issue.*

In other words, Jernigan argues that while that the ALJ summarized Dr. Nelson's opinion that she could only stand for two hours during an eight hour work-day, he didn't explain why he was rejecting it. But he *did* explain why he didn't believe that Jernigan was limited to two hours of standing in an eight hour period – he just did so in the context of responding to Dr. Kratzer's opinion. If he had just said "this applies to Dr. Nelson's identical opinion as well," it would pass muster. It is a waste of time and resources to remand the matter solely so the ALJ can add that proviso, as he no doubt will. Therefore, because I can predict with great confidence that the agency will reinstate its decision on remand, the failure to expressly respond to Dr. Nelson's

10

opinion is a harmless error (if it is even an error at all).

There's one final point supporting my conclusion that the ALJ's error (if he even committed one) was harmless. Based on my review of the record, I think that it's a bit of a reach to interpret Dr. Nelson's opinion to mean that Jernigan can't work at any job. To the contrary, on the part of the "Physicians Statement of Ability to Do Work Related Activities" form asking whether Jernigan will need to take unscheduled breaks, Dr. Nelson wrote "depending on activity." (R. at 311.) On the place asking how frequently she will be likely to be absent from her hypothetical job, he wrote "depends on work." (*Id.*) I don't want to read too much into those vague and cryptic statements, but I think that there's a decent argument that this response suggests that Dr. Nelson *did* think Jernigan would be able to work, at least at some jobs.

## CONCLUSION

Therefore, I find that the ALJ built the requisite bridge from the evidence in the record to his conclusion that Jernigan could stand for more than two hours in a given eight hour workday, and that he adequately "confronted" the substance of Dr. Nelson's opinion to the contrary. Alternatively, even if he didn't do so, I think that any resulting error is harmless because he'd no doubt reach the same result on remand. Accordingly, the agency decision below denying Jernigan's Title II social security disability application is **AFFIRMED**.

**SO ORDERED**.

ENTERED: March 22, 2013.

s/ Philip P. Simon  
PHILIP P. SIMON, CHIEF JUDGE  
UNITED STATES DISTRICT COURT