UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MARIA JERNIGAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Cause No. 3:11-cv-491-PPS |
| v. | ) |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

I issued an opinion affirming the decision of the Social Security Administration denying the Title II disability benefits application of Plaintiff Maria Jernigan. (DE 32.) Jernigan now seeks reconsideration of that decision. (DE 34.) For the reasons explained below, the Motion for Reconsideration is **DENIED**, and my initial decision stands.

Jernigan first disputes my finding that a doctor in question, Dr. Benjamin Nelson,[1] was not a treating physician. She argues that I committed manifest error when I observed that her principal motivation in going to see Dr. Nelson for a second visit in 2011 appears to be to have him fill out a social security disability form. This is important because Seventh Circuit authorities hold that a doctor who merely provides an opinion in connection with a social security disability application generally will not be a treating physician. *See, e.g., Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009). Jernigan objects to the application of that principle in this case

---

[1] I discussed the facts and circumstances surrounding Jernigan's application and subsequent lawsuit fully in my March 22 opinion. (DE 32 at 2-4.) Except as noted otherwise, those facts are hereby incorporated herein.

1

because, she argues, Dr. Nelson performed a physical examination and diagnostic test and prescribed treatments. (DE 35 at 2-3.)

Jernigan's argument misses the mark. I never said that she *only* went to Dr. Nelson to have him fill out a social security disability form. To the contrary, I included an important qualifier: "First, it appears that Jernigan's second visit in January 2011 was *primarily* so that Dr. Nelson could fill out her 'Physicians Statement of Ability to Do Work Related Activities' form." (DE 32 at 6 (emphasis added).) And indeed, I stand by that. Why else would Dr. Nelson have a copy of the form on hand? Either Jernigan brought it, or the doctor requested it in advance of her visit. More to the point, in the very first section of his treatment notes, Dr. Nelson remarked that "[Jernigan] is applying for disability." (R. at 300.) That would be an odd point to mention so prominently in the report unless Jernigan emphasized her social security disability application at the time of her visit. All of this led me to believe (as I still do) that one of Jernigan's main motivations – and perhaps *the* main one – in going to see Dr. Nelson in January 2011 was to have him complete her social security disability form.

Finally, even if that's not right, my opinion relied on much more than this observation. I also noted that Jernigan only saw Dr. Nelson twice, and then stopped going altogether – which would be odd if Dr. Nelson was her treating physician, given that she claims to be experiencing an immense amount of pain. (DE 32 at 6.) In response, Jernigan cites the fact that she doesn't have health insurance, implying that the cessation of her medical visits is due to financial hardship. (DE 35 at 3.) Jernigan says that she doesn't have the $7,000 needed for physical therapy. (*Id.*) Health care obviously is very expensive. But surely an office visit to Dr. Nelson costs much less than several thousand dollars. And she was able to pay for her visits to the

2

doctor in 2010 and 2011. There's certainly nothing in the record that suggests her finances took a significant downturn after January 2011. The most logical explanation for all of this seems to be that Jernigan was having health problems, she saw Dr. Nelson to get a diagnosis, she returned to have him sign the necessary social security disability documents, and then stopped going because his services were no longer needed. That makes him a non-treating physician.

Jernigan's second argument in her Motion for Reconsideration is that I improperly held that the reasons given by the ALJ for rejecting the opinion of Dr. John Kratzer, D.O, also necessarily would apply to Dr. Nelson's opinion. (DE 35 at 3-6.) Specifically, Dr. Kratzer – like Dr. Nelson – opined that he believed Jernigan was experiencing such tremendous pain that she could only stand for two hours out of an eight hour day; the ALJ noted that this was inconsistent with Dr. Kratzer's treatment notes over dozens of visits, which didn't contain any reports of that sort of pain. (R. at 17-18.) I held that although the ALJ didn't specifically say that Jernigan's failure to mention such debilitating pain in her numerous visits to Dr. Kratzer also rendered Dr. Nelson's opinion to the contrary suspect, that necessarily must be the case. (DE 32 at 8-9.)

Jernigan now seeks to relitigate that issue. She says that my analysis was an error because (i) it ignored crucial distinctions between Dr. Kratzer's and Dr. Nelson's opinions, (ii) it disregarded the fact that Jernigan says she can't afford a doctor visit, (iii) it disregarded Dr. Nelson's orthopedic specialty, which is a "checklist" factor, (iv) it ignored a single report of pain to Dr. Kratzer in May 2010, and (v) regardless of whether a similar analysis (to that used to reject Dr. Kratzer's opinion) could apply to Dr. Nelson's opinion, the fact is that the ALJ didn't apply one. (DE 35 at 3-6.)

3

None of this is particularly persuasive. First, any difference between Dr. Nelson's and Dr. Kratzer's opinions are a red herring. I didn't cite the ALJ's analysis of Dr. Kratzer as support for the ALJ's apparent decision to give Dr. Nelson's opinion little weight *in its entirety*. To the contrary, I used it solely to suggest that the ALJ no doubt disregarded Dr. Nelson's very narrow opinion concerning the amount of time Jernigan could be on her feet for the same reason he rejected Dr, Kratzer's opinion – that she had seen Dr. Kratzer dozens of times over several years yet his treatment notes never mentioned any such reports of severe pain that might interfere with her standing ability. (*Id.* at 8.) The fact that the two doctors' opinions might have differed with respect to other distinct issues is irrelevant to that limited analysis.

Second, as I explained above, Jernigan's ability to afford certain medical treatments or procedures is neither here nor there. The record is clear that she *was* able to afford to see Dr. Kratzer. We know this because she saw him more than twenty times over several years. (DE 32 at 3.) Yet in all of these visits, she never reported pain so intense that she couldn't stand or walk. That's the main point.

Third, I agree that I didn't acknowledge that as an orthopedic specialist, Dr. Nelson met one of the nondispositive "checklist" factors used to weigh a nontreating doctor's opinion. *See* 20 C.F.R. § 1527(c); *see also Simila*, 573 F.3d at 514. This omission is for good reason. As the SSA notes in its opposition brief (DE 39 at 3), Jernigan never raised this argument in her original briefing to me, even though the SSA contended that Dr. Nelson wasn't a treating physician in its response brief during those proceedings, and Jernigan thus had an opportunity to raise the "checklist" argument in her reply. Therefore, she's almost certainly waived it by this stage. And

4

in any event, even if she hasn't, I don't find it particularly persuasive. The checklist factors are not controlling by their very nature, and there's nothing in the record to suggest that any slight extra boost given by Dr. Nelson's specialty would have changed the ALJ's conclusion here.

Fourth, the failure of the ALJ to discuss Dr. Kratzer's opinion in detail – down to the particulars of each and every visit – isn't fatal to his ultimate conclusion. An ALJ need not discuss every piece of evidence, *see Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (cataloguing authorities), much less engage in an extensive parsing of its minute details. The thrust of the ALJ's analysis of Jernigan's relationship with Dr. Kratzer is that she saw him repeatedly over the course of several years for a number of routine reasons, and in all of that time, she didn't report pain so severe that it prevented her from standing or walking. (*Id.* at 17-18.) The fact that he may have omitted a single report of pain in a single visit towards the tail end of their relationship isn't enough to warrant reversal. And that's even assuming that the argument is properly before me – as the SSA again notes in its opposition brief (DE 39 at 4), this seems to be the first I've heard of the argument.

Fifth, Jernigan's last point on this issue – that regardless of whether or not the same analysis used to reject Dr. Kratzer's opinion might apply to Dr. Nelson's identical report, the fact is the ALJ didn't say that – is well-taken insofar as it goes. Indeed, it's why this case gave me some trouble in the first place, and why I spent so much time discussing it in my initial opinion. (DE 32 at 7-9.) And that's key point. I have already plowed that ground.

As I explained in detail in my original opinion, the reason that an ALJ must confront contrary evidence is to ensure that he or she is aware of that evidence, that he or she has considered it, and that he or she has good reasons for rejecting or disregarding it. (DE 32 at 8-9

(citing cases).) Here, the ALJ summarized Dr. Nelson's opinion in some detail (R. at 15-16), so I can be reasonably certain that he was aware of and considered it. And it is plain to me that the ALJ rejected that opinion based on the very same reason he rejected Dr. Kratzer's identical opinion.

Finally, Jernigan takes issue with my alternative holding that even if the ALJ erred by failing to explain why he was rejecting Dr. Nelson's opinion, it would be harmless error. (DE 35 at 6-7.) There's not much to say on this issue, except that as I explained above, I don't think my harmless error analysis was mistaken, for the reasons I stated in my initial opinion.

Therefore, and for all of the reasons explained above, Jernigan's Motion for Reconsideration (DE 34) is **DENIED**. My original decision stands, and the SSA's initial denial of her Title II disability application is **AFFIRMED**.

**SO ORDERED**.

ENTERED: August 28, 2013.

/s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT